# Kagan Decl. Ex. 6

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 2 of 64

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

THE CITY OF NEW YORK, ex rel. Steve Cohen,
Ari Maas and Ariella Barker; and
THE STATE OF NEW YORK, ex rel. Steve Cohen,      Index No. 101160/14
Ari Maas and Ariella Barker,

                    Plaintiffs,

              -against-                           **FIRST AMENDED COMPLAINT**

GROUP HEALTH INCORPORATED,                       FILED UNDER SEAL
EMBLEMHEALTH, INC., and EMPIRE                    New York False Claims Act
HEALTHCHOICE ASSURANCE, INC.,                    N.Y. Finance Law §§ 187 *et seq.*
dba Empire Blue Cross and Blue Shield,

                    Defendants.

-----------------------------------------------------------------x

Plaintiff-relators Steve Cohen, Ari Maas and Ariella Barker, by their attorneys Willens &

Scarvalone LLP, on behalf of the State of New York and the City of New York, allege on the

basis of their personal knowledge, relevant documents, and information and belief as follows:

<u>SUMMARY OF ACTION</u>

1.      Defendants are giant corporations that promise to provide health insurance to

millions of people.  This action concerns the defendants' Comprehensive Benefit Plan (the

"GHI-Empire Plan"), a health insurance policy offered by the City of New York to its employees

and retirees.  Over 600,000 "members" – City employees and retirees and their families – are

enrolled in the GHI-Empire Plan.  The GHI-Empire Plan is funded by an annual appropriation

from the City pursuant to contracts between the City and the defendants.  In 2015, for example,

the City paid GHI and Empire more than $4 billion for the GHI-Empire Plan.

2.      For many years, defendants violated the New York False Claims Act and other

statutes by grossly overstating the amount that they spent for members' medical expenses under

the GHI-Empire Plan.  Between 2008 and 2014, defendants used false reports and accounting

statements to overstate their expenses by an average of $55 million per year. Rather than return those funds to the City, as they are required to do by their contracts, defendants kept the money, effectively stealing over $500 million from the taxpaying citizens of New York City.

3.    Moreover, from 2008 to the present, defendants have procured their annual appropriation from the City by fraudulently describing the insurance benefits that defendants promised to pay to members under the GHI-Empire Plan. In its "Summary of Benefits of Coverage", in the "Summary Program Description", on its websites, and through other documents provided to the City and to members, GHI and Empire deliberately exaggerate the benefits paid under the Plan, while understating the uncovered costs that must be paid by members. Each year, the City relies on these false promises when it decides whether to renew its multi-billion contracts with defendants.

4.    Despite a series of enforcement actions by the New York State Attorney General's Office, GHI and Empire violated their contracts by failing to pay medical expenses that should have been covered under the terms of the GHI-Empire Plan, and by paying far less than they should pay on other claims. As a result of this illegal conduct, thousands of City employees paid excessive amounts for their medical care – money that they cannot afford and should not have to pay. Further, the City of New York did not receive the benefit of its contracts with GHI and Empire, because defendants knowingly failed to provide the services required by those contracts.

5.    The State of New York provides a substantial portion of the money paid by the City of New York to GHI and Empire, and the State also has a direct interest in protecting the health of City employees and their families through sound, affordable health insurance. Because defendants are using State funds for their own benefit and not for the benefit of employees covered by the GHI-Empire Plan, the State of New York has an independent claim against the defendants for violation of the New York False Claims Act.

2

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 4 of 64

## PARTIES

6.     Defendant Group Health Incorporated ("GHI") is a New York not-for-profit corporation with its primary place of business at 55 Water Street in New York County.  GHI is authorized to operate as an indemnity insurer under Article 43 of the New York Insurance Law. GHI is a subsidiary of defendant EmblemHealth, Inc.

7.     Defendant Empire Healthchoice Assurance, LLC ("Empire") is a Delaware corporation with its primary place of business at 1 Liberty Plaza in New York County.  Empire is a subsidiary of Anthem, Inc.  Empire does business as Empire Blue Cross Blue Shield under license from the Blue Cross and Blue Shield Association.

8.     Plaintiff-relator Ariella "Kami" Barker was a resident of New York City and a member of the GHI-Empire Plan from approximately 2005 until October 2013.  She was an employee of the City of New York's Law Department from 2005 to 2012.  She became seriously ill in 2012 and required dozens of medical procedures.  Since October 2012, she has been permanently disabled and confined to a wheelchair.  She now lives in North Carolina with her mother and grandfather.  Ms. Barker has personal knowledge of the facts described in this complaint, particularly the defendants' fraudulent refusal to pay legitimate claims that should be covered by the GHI-Empire Plan.

9.     Plaintiff-relator Steve Cohen is a resident of New York City.  He is a freelance writer and attorney.  For several years, he has worked with Ms. Barker to obtain and analyze records of her health insurance claims provided by GHI and Empire.  Mr. Cohen has personal knowledge concerning the allegations in this complaint, including the accounting and reporting schemes that defendants use to mislead members and the City about the benefits provided by the GHI-Empire Plan, and about the payments that defendants make each year to health care providers on their member's behalf.

3

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 5 of 64

10.     Plaintiff-relator Ari Maas is a resident of Rockland County, New York.  At all times relevant to this complaint, he was a New York City employee, working as a detective and now as a captain in the New York City Police Department.  He is a member of the GHI-Empire Plan.  He has personal knowledge concerning the allegations in this complaint, including the false statements provided by defendants to GHI-Empire Plan members and defendants' failure to pay legitimate claims that should be covered by the GHI-Empire Plan.

11.     Plaintiff-relators bring this action pursuant to section 190(2) of the New York False Claims Act on behalf of themselves and the City and State of New York.  They filed this action under seal on or about October 9, 2014.

12.     Plaintiff-relators are original sources of the factual allegations of this complaint within the meaning of section 188(7) of the False Claims Act.  In particular, Mr. Cohen provided the information to the New York State Attorney General that resulted in the Assurance of Discontinuance dated September 2014, as described below.

## JURISDICTION AND VENUE

13.     This is an action under the New York False Claims Act, N.Y. Finance Law §§ 190 and 191.  This Court has personal jurisdiction over the defendants GHI, EmblemHealth and Empire because they are located in New York County.

14.     Venue is proper in this Court pursuant to CPLR § 503.

## STATUTORY FRAMEWORK

A.   The New York False Claims Act

15.   The state False Claims Act provides, in pertinent part, that:

[A]ny person who: (a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 6 of 64

(c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision;

(d) has possession, custody, or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property; . . .

(g) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h) Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same;

shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. State Fin. Law § 189.

16. Under the False Claims Act, a "claim" is:

any request or demand, whether under a contract or otherwise, for money or property that: (i) is presented to an officer, employee or agent of the state or a local government; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

N.Y. State Fin. Law § 188(1).

17.     The FCA authorizes the Attorney General of the State of New York to bring

actions on behalf of both the State and City of New York again any person or corporation

suspected of violating the Act.  New York City may also bring an action on its own behalf.  N.Y.

State Fin. Law § 190(1).

B.  The New York Insurance Laws

18.     New York State's insurance laws and regulations protect individual policyholders,

including members of the GHI-Empire Plan, from deceptive practices by insurance companies. In particular, insurers are prohibited from engaging in unfair practices when they settle claims submitted by policyholders. N.Y. Ins. Law § 2601(a).

19.     Each insurer must supply to policyholders written information describing the provisions of coverage, including health care benefits, limitations and caps on benefits, exclusions of coverage, and the process for contesting any denial of coverage. The insurer must also provide a list of all participating providers and facilities, with their addresses and specialties. N.Y. Ins. Law § 3217-a.

20.     A certificate of insurance is required and must be provided to the employer of the insured persons for delivery to each member of the insured group. N.Y. Ins. Law §§ 3221(a)(6). No change in the policy is valid unless it has been evidenced in an endorsement or amendment to the policy signed by the policyholder and insurer. N.Y. Ins. Law §§ 3221(a)(2).

21.     Full and accurate disclosure of terms of coverage is required. The insurer may not make any misrepresentation concerning the terms or benefits of its policies or make any false or misleading statement concerning the amounts to be paid under its policies. N.Y. Ins. Law § 4226.

22.     In addition, New York law prohibits the use of deceptive acts or practices and false advertising in the conduct of any business or the furnishing of any service in the State. N.Y. Gen. Bus. Law §§ 349, 350.

C.  New York City's Employee Health Insurance Program

23.     The City of New York offers its employees a choice of health insurance plans. Depending on the plan selected by each employee, the City pays either the entire premium or a large portion of the premium. During the period from 2008 to 2014, the City made these payments through its agencies to defendants in response to invoices submitted by GHI and Empire.

6

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 8 of 64

24.     GHI bills the City for premium payments on either a monthly or bi-weekly basis, depending on the schedule for payroll payments to employees for each of the City's agencies, department and entities.  The GHI contract includes a "Premium Payment Schedule" that requires the City to pay GHI within five days after each payroll date.  As alleged below, each of these bills submitted to the City by GHI during the period covered by this complaint is a false claim.

25.     The City appropriates funds based on estimates provided by GHI, Empire and other insurers.  The New York City Administrative Code defines "health insurance coverage" as "[a] program of hospital-surgical-medical benefits to be provided by health and hospitalization insurance contracts entered into between the city and companies providing such health and hospitalization insurance."  NYC Admin. Code § 12-126(a).

26.     The statute provides that "The city will pay the entire cost of health insurance coverage for city employees, city retirees, and their dependents, not to exceed one hundred percent of the full cost of H.I.P.-H.M.O. on a category basis."  *Id.* at § 12-126(b).  This amount varies each year.  For example, in 2012, the City appropriated funds sufficient to pay medical expenses of $5,312 for an individual and $13,791 for a family.

27.     At all times relevant to this complaint, New York City paid the entire premium for the basic GHI-Empire Plan.  In 2015, for example, the City paid GHI and Empire more than $4 billion for the GHI-Empire Plan.

28.     The New York City Office of Labor Relations ("OLR") is the agency responsible for administering health plans on behalf of the City's employees and retirees.

D.  New York State Funding of the City's Employee Benefits Programs

29.     New York State is an important source of funds for the New York City Health Benefits Program and the GHI-Empire Plan.  In Fiscal Year (FY) 2017, the State provided an

7

estimated $14.37 billion of the City's total revenue of $85 billion, or 17% of the City's budget.

30. At all times relevant to this complaint, New York State has allocated funds to New York City to pay for the salaries, wages, and fringe benefits of City employees, including health insurance. The City Department of Education ("DOE"), for example, pays for between 16 and 20 percent of all DOE positions with funds derived from the State and federal government. In FY 2017, some 21,000 out of a total of 130,000 full-time DOE employees are funded by the State and federal government. The DOE received over $10 billion from the State during FY 2017.

31. The City uses revenues from the State to pay for all personnel costs attributable to those City employees whose positions are funded by the State, including salaries, wages, and fringe benefits like health insurance.

32. The costs of providing fringe benefits to City employees include the payments made by the City to cover the cost of providing health insurance under the City Employee Benefits Program. Health insurance costs are the largest component of fringe benefit costs.

33. The State of New York pays money to New York City every year to advance the State's interest in education, public housing and other programs. These funds are used by the City to pay the salaries, wages and fringe benefits of City employees who carry out those programs. Because New York City is a recipient of these State funds, any claim for payment by GHI or Empire submitted to the City of New York is a false claim for money or property of the State of New York, pursuant to the New York False Claims Act, N.Y. State Fin. Law § 188(1).

E. The Attorney General's Previous Enforcement Actions

34. Since 2009, New York State has brought a series of enforcement actions against GHI for failing to comply with provisions of New York law. These actions have resulted in formal agreements, known as Assurances of Discontinuance, in which GHI agreed to cease the

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 10 of 64

offending conduct.  GHI has failed to comply with any of the Assurances of Discontinuance

35.     In February 2009, GHI executed an Assurance of Discontinuance following an investigation by the New York State Attorney General into GHI's repeated failure to fairly reimburse customers treated by out-of-network doctors.  The Attorney General found that GHI did not reimburse policyholders at usual, customary, reasonable or prevailing rates, as promised, but instead paid artificially low reimbursement rates by using a biased database operated by Ingenix, Inc.  GHI agreed to use an impartial database operated by a not-for-profit company (now called FAIR Health, Inc.) to determine reimbursement rates for a period of five years after the new database was available.  GHI failed to comply with this agreement.

36.     In May 2012, GHI executed an Assurance of Discontinuance following an investigation by the New York State Attorney General into GHI's repeated failure to pay for certain hospital services as "in-network" when the treatment occurred at a participating hospital. The Attorney General found that GHI's descriptions of its coverage led members to believe that they would not pay out-of-network charges, but in fact GHI repeatedly mishandled such claims in 2010 and 2011.  GHI agreed to modify its claims-processing practices, procedures and policies to fully comply with the terms of its own certificate of insurance, and to pay restitution to plan members who were injured by the company's misconduct.  GHI failed to modify its practices, however, and continued to reimburse such services at "out-of-network" rates.

37.     In July 2014, EmblemHealth executed an Assurance of Discontinuance following an investigation by the New York State Attorney General into the improper denial of behavioral health services by both of EmblemHealth's divisions, GHI and HIP.  The Attorney General found that EmblemHealth improperly denied medically necessary services to more than 1 million New York City employees, retirees and their dependents.  EmblemHealth agreed to modify its claims-handling procedures and policies to fully comply with the terms of its own certificate of

9

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 11 of 64

insurance, to pay restitution of $31 million to plan members who were injured by the company's misconduct, and to pay a $1.2 million civil fine.

38.     In September 2014, GHI and EmblemHealth executed an Assurance of Discontinuance following an investigation by the New York State Attorney General into GHI's reimbursements for out-of-network services.  The Attorney General found that GHI did not make its reimbursement schedule available to GHI-Empire Plan members and did not fairly disclose that many doctors at in-network hospitals would be treated as non-participating providers and reimbursed at out-of-network rates.  The Attorney General also found that GHI did not disclose that the schedule was based on 1983 rates and rarely updated, resulting in very low levels of reimbursement.  GHI agreed to improve its consumer-facing materials to clarify these points and to create a $3.5 million Consumer Assistance Fund to pay claims to GHI-Empire Plan members injured by these practices.  GHI also promised the Attorney General (a) to assist Plan members who contact GHI prior to receiving pre-scheduled medical procedures to find participating providers in order to ensure that members can stay in-network, and (b) if GHI cannot identify participating providers, to treat claims for procedures provided by non-participating providers as if they were performed by participating providers.  At all times since the effective date of the Assurance of Discontinuance, GHI has violated this agreement.

### The GHI-Empire Plan

39.     The GHI-Empire Plan is one of up to 11 plans offered to City employees, and it is by far the most frequently chosen plan.  GHI and Empire jointly provide the GHI-Empire Plan to more than 600,000 New York City employees, retirees, and their families.

40.     Employees and retirees who are not eligible for Medicare can also select optional riders that provide additional coverage.  These riders include coverage for prescription drugs and enhanced reimbursements for medical procedures.  More than 50% of City employees choose at

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 12 of 64

least one of these riders. The premiums for these riders are paid by the employees, not by the City.

41.     In general, Empire is responsible for insuring hospital services provided to members covered by the GHI-Empire Plan, including inpatient and outpatient treatment, emergency room care, and services provided by doctors who are hospital employees. Empire also purports to cover healthcare services provided to members when they are traveling outside the New York area under Empire's BlueCard coverage.

42.     GHI is generally responsible for insuring in-patient and out-patient medical care services provided to members covered by the GHI-Empire Plan, including doctor's office visits, laboratory tests and x-rays, and services provided in hospitals by doctors who are not hospital employees.

43.     More New York City employees and retirees choose the GHI-Empire Plan than any other plan offered by the City because, in addition to its low cost, it was (during the time period covered by this complaint) one of only two plans that allow members to use out-of-network healthcare providers, including both hospitals and physicians. The option of selecting out-of-network doctors is affirmatively promoted in the City's Summary Program Description, which is the primary document provided to prospective members when they choose a plan. In 2013, 10.9% of the health services received by GHI-Empire Plan members were rendered by out-of-network providers.

44.     The GHI Contract. New York City entered into a contract with GHI to provide health insurance to City employees and retirees on or about February 25, 2000. The GHI contract refers to the City as the "Policyholder" or "Group."

45.     The cover sheet of the GHI contract states: "In consideration of the payment to GHI by the Policyholder of the premiums called for hereby, GHI agrees to provide the benefits

11

described herein to each Member, commencing on the Effective Date of this Contract and for the duration of the first Contract Period and thereafter, unless this Contract is terminated as provided herein."

46.     Article III of the GHI contract provides that "[e]ach Member shall be entitled to the medical benefits described in the Certificate(s) of Insurance and any riders or agreements made thereto attached hereto and made a part hereof."  Article VIII provides that "All benefits provided hereunder shall be paid to or on behalf of the Member as they accrue."

47.     Section 4.8 of the GHI contract provides that "Contractor shall render all services under this Agreement in accordance with applicable provisions of federal, state and local laws, rules and regulations as are in effect at the time such services are rendered."

48.     The City requires that GHI submit an annual "Statement of Experience" that details usage of the GHI-Empire Plan by City employees, retirees, and their dependents.  During the period covered by this complaint, the Statements of Experience described the premiums paid by the City to GHI for the GHI-Empire Plan and the optional riders; the claims paid by GHI to members of the GHI-Empire Plan and their healthcare providers; reserves held by GHI; the profit – called "retention" – that GHI claimed under the contract; and any dividend or rebate owed to the City.  Each Statement of Experience included detailed footnotes explaining adjustments to the rebates due to the City along with supporting documentation.

49.     In December of each year from 2008 through 2015, EmblemHealth and GHI submitted a Statement of Experience to OLR.  Each Statement of Experience purported to reconcile the expenses, reserves, and adjustments against the premiums paid to GHI by the City.  Based on these calculations, EmblemHealth and GHI delivered a rebate check to OLR for the City.

50.     Each Statement of Experience from 2008 through 2014 included a key document

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 14 of 64

called the "5500 Summary." This document purported to calculate the amount payable to New York City as a dividend or rebate for the GHI-Empire Plan and the optional riders for the previous fiscal year. The 5500 Summaries included footnotes adjusting the amount of the rebate by miniscule amounts: for example, in FY 2009, when there was a rebate to the City of more than $75 million, GHI noted an adjustment of $115. In FY 2010, when the rebate to the City was $69 million, GHI made an adjustment of $640. Similar adjustments were reflected on all of the Statements of Experience from FY 2008 through FY 2014, and in several of the cover letters sent by GHI to OLR with the Statements of Experience.

51.     Before 2015, each Statement of Experience also included a document called the "Non-Senior Medical Service Benefit Report" ("MSBR"), an itemized report of the amounts paid by GHI for medical services provided to GHI-Empire Plan members. Each MSBR contained over 400 pieces of data, identifying 40 different categories of medical services, such as in-patient surgery, out-patient surgery, doctor office visits, specialists, X-rays, and laboratory charges. In each MSBR, GHI told the City how many medical services were provided in each category, how much providers charged for those services, and how much GHI paid.

52.     As explained below, there are substantial discrepancies between the claims-paid data reported in the 5500 Summary and the comparable data in the MSBR, evidencing GHI's substantial underpayments to the City for the annual rebate mandated by the GHI contract.

53.     The premiums paid by the City to GHI under the contract are substantial. According to GHI's reports to the City, in fiscal year ("FY") 2008, the premium amount billed and received by GHI for the CBP Basic Non-Senior plan and COBRA was $1,156,087,739; and the premium for optional riders was $80,937,068.

54.     In FY 2009, the premium amount billed and received by GHI for the CBP Basic Non-Senior plan and COBRA was $1,220,069,571; and the premium for optional riders was

13

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 15 of 64

$79,684,412.

55.    In FY 2010, the premium amount billed and received by GHI for the CBP Basic Non-Senior plan and COBRA was $1,304,312,066; and the premium for optional riders was $81,785,622.

56.    In FY 2011, the premium amount billed and received by GHI for the CBP Basic Non-Senior plan and COBRA was $1,419,705,923; and the premium for optional riders was $85,780,145.

57.    In FY 2012, according to the FY 2012 Final Statement of Experience prepared by GHI and delivered to the City, GHI billed the City and received $1,550,576,120 in premiums from the City for the CBP Basic Non-Senior plan and COBRA.  GHI also received $86,820,918 in premiums from City employees for all optional rider programs.

58.    In FY 2013, according to the FY 2013 Final Statement of Experience prepared by GHI and delivered to the City, GHI billed the City and received $1,630,361,343 in premiums from the City for the CBP Basic Non-Senior plan and COBRA.  GHI also received $82,694,321 in premiums from City employees for all optional rider programs.

59.    In FY 2014, according to the FY 2014 Final Statement of Experience prepared by GHI and delivered to the City, GHI billed the City and received $1,697,702,548 in premiums from the City for the CBP Basic Non-Senior plan and COBRA.  GHI also received $80,294,216 in premiums from City employees for all optional rider programs.

60.    In FY 2015, the fiscal arrangement between the City and GHI changed.  The accounting format and terminology changed.  According to the FY 2015 Final Statement of Experience prepared by GHI and delivered to the City, GHI billed the City and received $1,886,067,288 in "Premiums reported to EmblemHealth under the Minimum Premium Arrangement" from the City for the CBP Basic Non-Senior plan and COBRA.  GHI also

14

received $85,413,545 in premiums from City employees for all optional rider programs.

61.    <u>The Empire Contract</u>.  New York City entered into a contract with Empire to provide health insurance to City employees and retirees on or about May 31, 2000, and updated with a "Funding Rider" in March, 2010.  The cover sheet of the Empire contract provides: "In consideration of the payment of premiums as provided in Article XII-E hereof, Empire agrees to provide benefits in accordance with this Contract for a period of one year beginning . . . on July 1, 1997, and from year to year thereafter, unless this Contract is terminated as provided herein."

62.    The Empire contract provides: "Contractor shall render all services under this Agreement in accordance with applicable provisions of federal, state and local laws, rules and regulations as are in effect at the time such services are rendered."  App. A, ¶ 4.8.

63.    According to the "New York City Funding Rider to the Empire Healthchoice Assurance, Inc. Group Policy for Hospital Services," the City is obligated to transfer funds to an Empire-controlled bank account for payment of claims submitted to Empire under the hospitalization part of the GHI-Empire Plan.  Since at least April 2010, the City has made regular payments to this "Sub Account" based on data provided by Empire.  In addition, Empire submits monthly invoices to the City for its "retention" or profit.  The City regularly pays these invoices, in addition to the payment for estimated medical claims.

64.    In FY 2008, according to the Final Statement prepared by Empire and delivered to the City, New York City paid $1,148,573,163 in premiums for non-Medicare claims payment; and paid Empire $57,137,840 in retention fees.

65.    In FY 2009, according to the Final Statement prepared by Empire and delivered to the City, New York City paid $1,275,368,254 in premiums for non-Medicare claims payment; and paid Empire $61,028,110 in retention fees.

66.    In FY 2010, according to the Final Statement prepared by Empire and delivered to

the City, New York City paid $1,136,159,652 in premiums for non-Medicare claims payment;

and paid Empire $69,015,744 in retention fees.

67.    In FY 2011, according to the Final Statement prepared by Empire and delivered to

the City, New York City paid $1,585,366,901 in premiums for non-Medicare claims payment;

and paid Empire $24,642,220 in retention fees.

68.    In FY 2012, according to the Final Statement prepared by Empire and delivered to

the City, New York City paid $1,689,407,701 in premiums for non-Medicare claims payment;

and paid Empire $25,322,909 in retention fees.

69.    In each year since 2012, the City has paid at least $1.6 billion to Empire in

premiums (also called "Maximum Liability") for non-Medicare claims and approximately $25

million in retention fees.  Empire has submitted bills to the City for payment of premiums and

retention throughout the period covered by this complaint.  Each of these bills is a false claim for

payment submitted in violation of the False Claims Act.

Insurance Coverage Provided by the GHI-Empire Plan

70.    The details of the coverage provided by GHI under the GHI-Empire Plan are

contained in the GHI Certificate of Insurance.  The most recent version of the Certificate of

Insurance is dated August 2008.  It states that, under the "Group Contract" between GHI and

New York City, "GHI will provide the benefits described in this booklet to persons enrolled in

the New York City Employee Benefits Program."

71.    The Summary Program Description describes GHI-Empire Plan and the rules,

policies and procedures related to enrollment and use of health benefits.  The Summary Program

Description is sent to City employees and retirees and is also featured on the City's Health

benefits website maintained by the Office of Labor Relations.  The Summary Program

Description contains two pages describing the Plan.  One page is prepared by GHI, and the other

page is prepared by Empire.

72.     GHI also publishes a Summary of Benefits and Coverage for the GHI-Empire Plan

on the EmblemHealth website.  This document provides additional details about the Plan.

73.     On information and belief, Empire has not provided a Certificate of Insurance to

any agency of New York City concerning the GHI-Empire Plan.  Unlike GHI, Empire does not

publish a simple Summary of Benefits on its website.  (It does provide members with a difficult-

to-use "Medical Coverage Details" section on its website.)  The only official description that

Empire has provided to the City concerning the terms of its insurance under the GHI-Empire

Plan is a 32-page booklet dated March, 1998.  That booklet is in the possession of OLR, but it is

not generally available to members.

74.     Empire has refused to provide a Certificate of Insurance or any other description of

the coverage provided by the GHI-Empire Plan to plaintiff-relator Ari Maas, despite multiple

requests.  As a member of the GHI-Empire Plan, Mr. Maas is entitled to receive a copy of the

Certificate of Insurance.

75.     The GHI-Empire Plan allows members to use in-network providers, including

doctors and hospitals, and out-of-network providers.  In general, defendants pay the full amount

charged by in-network providers for their services to Plan members, after co-pays and

deductibles.  When members use out-of-network providers, however, defendants pay only a

fraction of the fee charged to Plan members.

76.     Defendants pay the in-network providers directly, but they do not pay out-of-

network providers.  Instead, Plan members are required to pay fees charged by out-of-network

providers directly to those providers.  Defendants then determine whether to reimburse members

for some portion of those fees.  The reimbursement rate depends on a variety of factors,

including:

17

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 19 of 64

- The "Allowed Amount" (also called the "Allowed Charge" or "Schedule" by the defendants) is the reimbursement amount calculated for each specific medical procedure;

- The "Optional Rider" (or "Enhanced Schedule Optional Rider") is a supplemental insurance policy selected and paid by many members of the GHI-Empire Plan. It is supposed to increase the reimbursement rate for out-of-network procedures.

- The "Catastrophic Care" provision of the GHI-Empire Plan is supposed to limit the out-of-pocket costs incurred by member who are seriously ill by providing additional reimbursement when those costs exceed $1,500 in a calendar year.

77.    Defendants' description of the reimbursement offered to GHI-Empire Plan members for hospital services has changed over time in a manner that is deliberately unclear and not transparent.

78.    Between 2004 and 2008, defendants stated that "Empire's Hospital Plan offers you paid-in-full inpatient care for up to 365 days of hospitalization." Ambulatory (or outpatient) surgery "is covered at 80% of approved charges."

79.    In December 2009, defendants sent a letter to GHI-Empire Plan members announcing that, effective January 1, 2010, the Empire portion of the Plan would become a Preferred Provider Organization ("PPO") Plan. Procedures covered by the PPO Plan "include services at hospitals, ambulatory surgery and hemodialysis facilities and other ancillary services and procedures connected to in-hospital and out-patient facilities." The letter stated that "Physician services under the GHI-CBP portion of the plan are not affected by this change." As alleged below, the letter falsely described benefits provided by Empire to Plan members.

80.    Beginning in 2010, reimbursement of out-of-network services at hospitals and

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 20 of 64

outpatient facilities was calculated at "80% of the average county rate" and plan members were responsible for paying their deductible and 20% coinsurance. Defendants used this reimbursement formula from 2010 through 2012. As alleged below, "average county rate" is a misleading term that does not reflect the average charges for healthcare services in any New York county within the catchment area of the GHI-Empire Plan.

81.    In 2013, the reimbursement formula changed again. Defendants removed the reference to "average county rate" from the annual Summary Program Description and replaced it with "80% of the allowed rate" without explaining the change to Plan members.

<u>DEFENDANTS' FRAUDULENT SCHEME</u>

82.    Under their contracts with the City, Empire and GHI could have earned a reasonable profit simply by providing reliable insurance to members of the GHI-Empire Plan and billing the City for the insurance premiums plus the "retention" allowed by the contract. Instead, defendants determined to defraud the City – while providing inadequate health insurance to millions of people. Although the harm to the health and well-being of those people cannot be quantified, the fraudulent scheme has cost the City and State of New York over $500 million.

83.    Defendants' scheme has three parts, described in more detail below. *First*, GHI has used false reports and accounting statements to overstate the amount that it spent on members' medical expenses under the GHI-Empire Plan. By overstating its costs, GHI knowingly *understated* the amount that it was required to rebate to the City at the end of each fiscal year. In short, GHI and EmblemHealth have engaged in old-fashioned accounting fraud to overcharge the City for the insurance services covered by the GHI-Empire Plan.

84.    *Second*, to induce more City employees and retirees to choose the GHI-Empire Plan, GHI and Empire have fraudulently described the insurance offered to members under that plan. In a series of false benefit summaries and other documents provided to the City and

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 21 of 64

members, GHI and Empire deliberately exaggerated the benefits available under the Plan, while understating the uncovered costs that must be paid by members.  In this way, defendants fraudulently induced the City to enter into the GHI contract and the Empire contract, and to renew those contracts each year.

85.     *Third*, GHI and Empire are failing to pay medical expenses that they are required to pay under the terms of the GHI-Empire Plan, and by paying far less than they should pay on other claims.  As illustrated by the horrific case of plaintiff-relator Kami Barker, described below, thousands of City employees are paying healthcare costs that should be covered by the GHI-Empire Plan and paid by defendants.  Simply put, the City of New York is not receiving the benefit of its contracts with GHI and Empire, because defendants are knowingly failing to provide the insurance required by those contracts.  As a result, each claim submitted by defendants for payment under those contracts is a false claim.

A.  The Fraudulent Accounting Scheme

86.     Every year, GHI and Empire submit reports to the City that purport to describe the healthcare claims submitted and the benefits paid under the GHI-Empire Plan.  The two principal documents used by the City to determine whether to renew the contract with GHI and offer the GHI-Empire Plan to City employees and retirees are (a) the annual Statement of Experience written by GHI and submitted to the City; and (b) the annual Renewal Analysis written by GHI and submitted to the City to be used as the basis for negotiating the premium rates that will be paid by the City to GHI for the following year.  These reports state the expenses incurred by GHI and Empire, including claims paid for healthcare services, advertising and other business expenses, and the retention or profit allowed by the GHI and Empire contracts.  They serve as the formal, certified accounts of revenues received by GHI and Empire.

87.     Under their contracts, GHI and Empire are required to rebate to the City an amount

based on the adjusted difference between the premiums that they collected in the preceding year and the claims that they paid on behalf of GHI-Empire Plan members. During the period covered by this complaint, GHI has paid substantial rebates to the City. Between 2008 and 2014, GHI reimbursed the City an average of $128 million annually, with rebate amounts ranging from $69 million to $211 million per year.

88.    False Statements about Rebates Due to the City.    From at least 2008 to 2014, GHI paid the City of New York substantially less than the rebates due under its contract. In order to avoid repaying the City all of the amounts that are due, GHI submitted false reports to the City for each fiscal year from at least 2008 through 2014.

89.    GHI knowingly misstated the amounts that it paid for healthcare claims and other expenses under the GHI-Empire Plan. In particular, GHI's Statements of Experience overstated the amounts that GHI paid to healthcare providers and members for services covered by the GHI-Empire Plan. This overstatement is reflected in the substantial discrepancies between the claims-paid data reported in the 5500 Summary and the comparable data in the Non-Senior Medical Service Benefit Report, both of which are contained in the Statement of Experience submitted by GHI.

90.    GHI knowingly overstated the amounts it paid for healthcare claims and other expenses in order to avoid paying to the City all of the funds GHI knew to be due to the City, and to conceal that fact from the City.

91.    In 2008, GHI reported $923,907,755 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider. In fact, GHI paid $875,280,466 in non-senior and Enhanced Major Medical claims in that fiscal year. Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $48 million. GHI knowingly withheld that amount from the

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 23 of 64

City when it paid the annual rebate required by its contract.

92.  In 2009, GHI reported $989,550,995 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $937,425,311 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $52 million.  GHI knowingly withheld that amount from the City when it paid the annual rebate required by its contract.

93.  In 2010, GHI reported $1,056,175,656 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $996,926,381 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $59 million.  GHI knowingly withheld that amount from the City when it paid the annual rebate required by its contract.

94.  In 2011, GHI reported $1,120,487,938 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $1,057,467,771 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $63 million.  GHI knowingly withheld that amount from the City when it paid the annual rebate required by its contract.

95.  In 2012, GHI reported $1,205,846,593 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $1,141,056,494 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $64 million.  GHI knowingly withheld that amount from the

City when it paid the annual rebate required by its contract.

96.    In 2013, GHI reported $1,229,618,291 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $1,160,109,720 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $69 million.  GHI knowingly withheld that amount from the City when it paid the annual rebate required by its contract.

97.    In 2014, GHI reported $1,309,231,524 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  In fact, GHI paid $1,231,393,231 in non-senior and Enhanced Major Medical claims in that fiscal year.  Even after accounting for other claims and expenses paid by GHI, the annual Statement of Experience overstated the cost of the GHI-Empire Plan by at least $77 million.  GHI knowingly withheld that amount from the City when it paid the annual rebate required by its contract.

98.    The overstated costs between 2008 and 2014 can be summarized as follows:

|  | 5500 Report Non-Senior Claims Paid including Major Medical Optional Rider | Non-Senior Medical Service Benefit Report | Difference |
|---|---|---|---|
| 2008 | $923,907,755 | $875,280,466 | $48,627,289 |
| 2009 | $989,550,995 | $937,425,311 | $52,125,684 |
| 2010 | $1,056,175,656 | $996,926,381 | $59,249,275 |
| 2011 | $1,120,487,938 | $1,057,467,771 | $63,020,167 |
| 2012 | $1,205,846,553 | $1,141,056,494 | $64,790,059 |
| 2013 | $1,229,618,291 | $1,160,109,720 | $69,508,571 |
| 2014 | $1,309,231,524 | $1,231,393,231 | $77,838,293 |

23

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 25 of 64

99.   Defendants EmblemHealth and GHI knowingly designed their annual Statements of Experience to hide the true cost of claims and other expenses related to the GHI-Empire Plan. Although these reports are nearly 50 pages long and filled with dozens of charts and thousands of figures, they offer no support for the critical calculation of the City's annual rebate.  Instead, they offer conflicting data that cannot be reconciled using any recognized accounting principles.

100.   There is no doubt that EmblemHealth and GHI have deliberately falsified their annual Statements of Experience.  Every year, the reports consistently overstate defendants' costs by a substantial amount.  Every year, the overstatements of claims paid by GHI steadily increased, from $48 million in 2008 to $77 million in 2014.

101.   In 2015, GHI reported $1,378,541,406 in non-senior claims paid under the GHI-Empire Plan and the Enhanced Major Medical optional rider.  Based on information provided to the relators by OLR, it appears that, for the first time during the period covered by this complaint, GHI did not include a Non-Senior Medical Service Benefit Report in the Statement of Experience for FY 2015.

102.   GHI withheld the 2015 MSBR from OLR after it learned that the State and City were investigating the discrepancies described above.  On information and belief, GHI overstated the amount paid in claims in its Statement of Experience for 2015 and withheld the information that the City needed to identify that overstatement.

103.   As alleged above, each Statement of Experience included a document called the "5500 Summary" that shows how GHI calculated the amounts payable to New York City as a dividend or rebate for the GHI-Empire Plan and the optional riders.  Each 5500 Summary stated the amount that GHI paid for "total incurred claims" as the sum of CBP Basic Non-senior claims, the Senior Care Programs and the optional riders.

104.    Each Statement of Experience also included a Non-Senior Medical Service Benefit Report itemizing the amounts paid by GHI for medical services provided to GHI-Empire Plan members.  The MSBR did not include claims paid under the Senior Care Program, the Behavioral Management Plan ("BMP") or the prescription drug rider.  These programs are broken out separately in the 5500 Summaries.  After the MSBRs and the 5500 Summaries are adjusted to account for these differences between the two documents, it is apparent that GHI's statements in the 5500 Summaries, as described in paragraphs 91-98 above, are false.

105.    Because GHI provided the 5500 Summaries to the City to document and support the annual rebates, the false statements in the 5500 Summaries necessarily affected the amounts of the rebates that the City received.  The City received and accepted annual rebates from GHI that were substantially lower than the rebates actually due to the City under GHI's contract.  Payment of accurate rebates was and is an essential part of the GHI contract.

106.    <u>False Statements about GHI's Retention and Expenses</u>.  As alleged above, GHI also submits an annual "Renewal Analysis" to the City's Office of Labor Relations.  In each Renewal Analysis from 2008 through at least 2014, GHI overstated its expenses for sales and marketing in connection with the GHI-Empire Plan.  These expenses are included in the annual retention that GHI and Empire are permitted to collect under their contracts with the City.  GHI knowingly billed the City for sales and marketing expenses that it did not incur.

107.    In the Renewal Analysis for 2008 through 2012, GHI reported sales and marketing expenses as follows:  $8,826,000 in 2008; $10,436,000 in 2009; $16,830,000 in 2010; $16,895,000 in 2011.

108.    On information and belief, these amounts for sales and marketing expenses grossly overstate the actual expenses incurred by GHI for sales and marketing with respect to the GHI-Empire Plan.  Aside from the preparation of the annual Summary Program Description, GHI

does not actively market the Plan to potential members.  There are no major advertising campaigns touting the advantages of the Plan or the disadvantages of alternative plans.  By overstating its expenses, GHI knowingly inflated the retention amount it was purportedly due for each year from 2009 through 2013, causing the City of New York to pay more than GHI was entitled to receive.

109.  In the Renewal Analysis for 2013, the marketing expense was estimated to be $18,484,000 for FY 2012; and projected to be $19,408,000 in FY 2013.  By inflating its estimated and projected expenses, GHI continued to overcharge the City for marketing expenses at all times relevant to this complaint.

110.  GHI also received more than it was entitled under the contract by knowingly failing to make necessary accounting adjustments that, had they been made, would have resulted in a correction of rebates paid in prior years.  Each Renewal Analysis included "recommendations" for the annual increase in the City's premiums for the GHI-Empire Plan and a calculation of the retention due to GHI.  This calculation is based the administrative expenses that GHI purportedly incurred in providing and supporting the Plan, including the overstated sales and marketing expenses.  GHI reported administrative expenses of $127.5 million in FY 2009, and these expenses increased each year to a projected $153.2 million in FY 2013.

111.  The annual Renewal Analysis also included cash flow statements for claims paid during previous years.  The annual Statement of Experience is prepared approximately six months after the conclusion of the fiscal year.  Some insurance claims are submitted by members of the GHI-Empire Plan after the fiscal year, and even after the preparation of the Statement of Experience.  While most of these claims are captured by the Statement of Experience and reflected in both the 5500 Summary and MSBR, a few late claims are not reflected in GHI's accounting until the later-compiled cash flow statements in the Renewal Analysis.

26

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 28 of 64

112.  Significantly, the cash flow statements in the annual Renewal Analysis do not reconcile with the annual 5500 Summaries in the Statements of Experience.  Nor do they reconcile with the MSBR.

- Based on the 2011 Renewal Analysis, which includes cash flow statements for FY 2008, there is a discrepancy of $71,188,515 with the FY 2008 Statement of Experience 5500 Summary.

- Based on the 2011 Renewal Analysis, which includes cash flow statements for FY 2009, there is a discrepancy of $3,094,544 with the FY 2009 Statement of Experience 5500 Summary.

- Based on the 2011 Renewal Analysis, which includes cash flow statements for FY 2010, there is a discrepancy of $7,054,098 with the FY 2010 Statement of Experience 5500 Summary.

- Based on the 2011 Renewal Analysis, which includes cash flow statements for FY 2011, there is a discrepancy of $27,213,517 with the FY 2011 Statement of Experience 5500 Summary.

113.  The Renewal Analyses for 2012 and 2013 reflect different discrepancies with the paid claim amounts represented on the annual Statements of Experience.  In almost every case, the amounts for paid claims reported in the Statement of Experience are substantially higher than the amounts reported in the Renewal Analysis for that same year.

114.  On information and belief, EmblemHealth and GHI never revised the Statements of Experience to reflect these substantial changes in the paid claims amount; nor did they adjust the amount of the rebate paid to the City to reflect the subsequently-calculated paid claims amount. As a result, there were substantial underpayments of the annual rebate paid to the City, which

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 29 of 64

EmblemHealth and GHI never corrected.

115.  Defendant EmblemHealth, the parent company of GHI, actively participated in the operation of GHI, the administration of the GHI-Empire Plan, and the submission of false reports (including the Statements of Experience) to the City, as alleged herein.  The retention paid by the City to GHI was a very large proportion of EmblemHealth's annual net income.  Nearly all of EmblemHealth's net income in 2008 and 2009 resulted from the GHI-Empire Plan, and its profits in subsequent years would have been less than half of the amounts reported in the company's annual reports if the retention had been accurately calculated.

116.  On information and belief, the reports submitted to the City by GHI were reviewed and approved by EmblemHealth.  The annual Statements of Experience and the annual Renewal Analysis were sent by EmblemHealth directly to the City as follows:

a.  FY 2008 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 31, 2008.

b.   FY 2009 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 31, 2009.

c.  FY 2010 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 30, 2010.

d.  FY 2011 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 31, 2011.

e.  FY 2012 Final Statement of Experience sent from George Babitsch, Senior Vice

President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 31, 2012.

f.   FY 2013 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on December 31, 2013.

g.   FY 2014 Final Statement of Experience sent from George Babitsch, Senior Vice President of EmblemHealth, to Georgette Gestely, Director of Employee Benefits Program for OLR, on December 30, 2014.

h.   FY 2015 Minimum Premium Final Statement of Experience sent from Paula Tavsanli of EmblemHealth to Georgette Gestely, Director of Employee Benefits Program for OLR, on December 30, 2015.

i.   FY 2009 Renewal Analysis sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on March 31, 2008.

j.   FY 2010 Renewal Analysis sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on March 31, 2009.

k.   FY 2011 Renewal Analysis sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on March 29, 2010.

l.   FY 2012 Renewal Analysis sent from George Babitsch, Senior Vice President of EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on March 15, 2011.

m.   FY 2013 Renewal Analysis sent from George Babitsch, Senior Vice President of

EmblemHealth, to Dorothy Wolfe, Director of Employee Benefits Program for OLR, on March 15, 2012.

B. <u>Fraudulent Inducement: Misrepresenting the GHI-Empire Plan</u>

117. Each year, the City must decide whether to cancel or continue its contracts with Empire and GHI, and whether to offer the GHI-Empire Plan to its employees and retirees. Those decisions are based on information provided by defendants to the City concerning the cost of insurance, the scope of the benefits offered to subscribers, and other factors. Because of the massive size and profitability of their contracts with the City, Empire and GHI have a strong incentive to misrepresent the facts.

118. At all times relevant to this complaint, GHI and Empire provided false and misleading documents concerning the GHI-Empire Plan to the City and its employees and retirees. In addition, GHI and Empire deliberately concealed critical facts about the insurance coverage provided to GHI-Empire Plan members.

119. At all times relevant to this complaint, Defendants' false statements about the coverage and reimbursements provided under the GHI-Empire Plan were material to the City's annual decision whether to offer the plan to its employees and retirees. The scope of the coverage afforded under the Plan and the level of reimbursements provided to Plan members were (and are) an essential part of the GHI and Empire contracts. If defendants had disclosed the gaps in coverage and the true reimbursement rates paid to GHI-Empire Plan members, these disclosures would, at a minimum, have influenced the City's annual decision whether to offer the plan to its employees and retirees, and what the financial terms or premium amounts should be for a plan with such coverage gaps and limited reimbursements.

120. Moreover, as a result of defendants' false statements, employees and retirees of the City were fraudulently induced to sign up for the GHI-Empire Plan and to renew their annual

subscriptions to the Plan.  Defendants knowingly used false statements to increase the number of members in the GHI-Empire Plan, causing the City to pay much higher annual premiums to defendants.

121.  <u>False Descriptions of Plan Coverage and Benefits</u>.  As alleged above, the GHI contract provides that each member is entitled to the medical benefits described in the Certificate of Insurance, as modified by riders or subsequent agreements with the City.  The contract identifies seven riders dated 1997 and 1998.  As noted, the contract is dated February 25, 2000, and no subsequent versions of the contract are publicly available.

122.  The Empire contract states that "Empire agrees to provide benefits in accordance with this Contract" in consideration of the City's payment of premiums.  The contract describes the benefits available to GHI-Empire Plan members for hospital service, hospice care, out-patient treatment and other medical services.

123.  From 2008 to 2014, members and potential members of the GHI-Empire Plan learned about the scope of coverage and the reimbursement rates in two documents: (i) the Summary Program Description, which was sent to all City employees and retirees and was the centerpiece of the City's Health Benefits website; and (ii) the Summary of Benefits and Coverage provided to members on the EmblemHealth website.

124.  As alleged in detail below, Empire and GHI knowingly misrepresented the GHI-Empire Plan to the City and to plan members, in at least four ways.

125.  *First*, GHI falsely described to the City and its employees and retirees how it calculated reimbursements paid to GHI-Empire Plan members for their out-of-network healthcare services.  At all times relevant to this complaint until 2014, the Summary Program Description stated:

**Non-Participating Provider Benefits** -- When you do not use the services of a participating provider, GHI provides coverage for the services of non-participating providers.  Payment for these services is made directly to you under the NYC Non-Participating Provider Schedule of Allowable Charges (Schedule).  The rate at which you will be reimbursed for a particular service is contained within the Schedule.  These reimbursement rates were originally based on 1983 procedure allowances, and some have been increased periodically.  The reimbursement levels, as provided by the Schedule, may be less than the fee charged by the non-participating provider.  Please note that certain non-participating provider reimbursement levels may be increased if you have the optional rider.  The subscriber is responsible for any difference between the fee charged and the reimbursement, as provided by the Schedule.  A copy of the Schedule is available for inspection at GHI.

126.  This statement is materially false and misleading.  As recently as 2016, with a few exceptions, GHI used reimbursement rates that had not changed since 1983.  It is misleading to say that these rates were "originally" based on 1983 procedure allowances because that statement implies that they are no longer based on 1983 allowances.  It is also false to say that "some" reimbursement amounts "have been increased periodically" when few, if any, of the amounts in the Schedule have been increased since 1983.

127.  It is also materially false and misleading to say that "The reimbursement levels, as provided by the Schedule, may be less than the fee charged by the non-participating provider." In fact, GHI knew that its reimbursements were almost always less than the provider's fee.

128.  Also grossly misleading is GHI's Summary of Benefits and Coverage (the "SBC"). The SBC states – in a highlighted box – "Your Cost If You Use a Non-Participating Provider" is a "0% co-insurance" for many important medical events, including office visits to primary care physicians and specialists, x-rays and immunizations.

| Common Medical Event | Services You May Need | Your Cost If You Use a Participating Provider | Your Cost If You Use a Non-Participating Provider | Limitations & Exceptions |
|---|---|---|---|---|
| If you visit a health care provider's office or clinic | Primary care visit to treat an injury or illness | $15 co-pay | 0% co-insurance | ----None---- |
| | Specialist visit | $20 co-pay | 0% co-insurance | Does not apply to all specialists. |
| | Other practitioner office visit | $15 co-pay | 0% co-insurance | ----None---- |
| | Preventive care/screening/immunization | $15 co-pay | 0% co-insurance | ----None---- |
| If you have a test | Diagnostic test (x-ray, blood work) | $15 co-pay | 0% co-insurance | ----None---- |
| | Imaging (CT/PET scans, MRIs) | $15 co-pay | 0% co-insurance | Pre-certification required. |

Based on this information, members and potential members of the GHI-Empire Plan would reasonably understand that, other than a small co-payment, they would not have to pay for these out-of-network services. In fact, GHI paid only a small portion of the fees for those services, and forced GHI-Empire Plan members to pay the balance.

129. During the period from 2008 through 2011, GHI paid *less than half* of the providers' fees for in-hospital and ambulatory surgery; and from 2012 through 2014 *less than one-third* of those fees. For doctor's office visits and other services, between 2008 and 2014, GHI paid *less than one-fifth* of the providers' fees. Moreover, the reimbursement rates decreased in each category during this period – a critical fact that GHI failed to disclose to the City. That decrease is illustrated here:

| Percent reimbursement for Out-of-Network Care | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| In-Hospital surgery | 45% | 42% | 38% | 36% | 32% | 28% | 26% |
| Out of Hospital Surgery | 45% | 42% | 38% | 36% | 33% | 32% | 29% |
| Total Office Visits | 16% | 13% | 15% | 15% | 13% | 13% | 13% |
| Total Other Services | 20% | 18% | 17% | 16% | 18% | 16% | 17% |

130. The option to use out-of-network doctors and hospitals is a valuable benefit offered by the GHI-Empire Plan, and it is heavily utilized by Plan members. In just one category of medical care in 2013, designated on the Non-Senior Medical Service Benefits Report as "office visits" (and detailed as nine different types of doctors' office visits), Plan members submitted claims for 676,897 charges by out-of-network doctors. Yet GHI reimbursed Plan members at an

33

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 35 of 64

abysmally low rate of 13% for these visits.

131.  As the New York Attorney General concluded in the 2014 Assurance of Discontinuance, "GHI does not sufficiently describe the limitations of GHI Plan's reimbursement of out-of-network providers and the resulting financial consequences to members and prospective members."  The Summary Program Description and other GHI publications "do not accurately set forth the potentially wide gap between the out-of-network reimbursement and out-of-network charges, and potentially substantial out-of-pocket amounts for which GHI Plan members will be responsible."

132.  Defendants induced City employees and retirees to select the GHI-Empire Plan by falsely describing how reimbursements were calculated and paid for out-of-network healthcare services.  These false descriptions of the reimbursement levels at which out-of-network healthcare services would be paid were material to the City's annual decision whether to renew the GHI and Empire contracts and to offer the GHI-Empire Plan to City employees and retirees.  The reimbursement levels at which out-of-network healthcare services are paid were (and are) an essential part of the GHI contract.  Disclosure of the true facts would, at a minimum, have influenced the City's annual decision whether to offer the GHI-Empire Plan to its employees and retirees, and on what contractual terms.

133.  After it agreed to comply with the Assurance of Discontinuance in September 2014, GHI and Empire created a new description of its reimbursement policies.  The Summary Program Descriptions for 2015 and 2016 effectively conceded the misstatements and omissions identified by the Attorney General:

a.   GHI admitted that its reimbursement rates in the schedule of allowed amounts "are not related to usual and customary rates or what the provider may charge but are set at a fixed amount based on GHI's 1983 reimbursement rates."

34

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 36 of 64

b.  GHI admitted that most of the reimbursement rates in the schedule have not increased since 1983.

c.  GHI admitted that its reimbursement rates paid by the GHI-Empire Plan "will likely be less (and in many instances substantially less) than the fee charged by the out-of-network provider."

These admissions did not alleviate the harm caused by GHI's previous misrepresentations, to the City and to Plan members, concerning the reimbursement rates for out-of-network services.

134.  *Second*, GHI and Empire falsely represented to the City and its employees and retirees that services provided to plan members in an "in-network" hospital would be paid as in-network services.  In fact, members of the GHI-Empire plan involuntarily encounter *out-of-network* providers during a hospital procedure when a doctor on the medical team is not considered a member of the network, and are thereby forced to pay the higher costs associated with out-of-network providers.

135.  The Summary Program Description and other statements by GHI and Empire falsely imply that in-network services include treatment by physicians in Blue Cross/Blue Shield hospitals and other in-network facilities.  In the first paragraph of its description of the GHI-Empire Plan in the Summary Program Description -- from 2008 through the present -- Empire states:

> A PPO plan provides coverage for both in-network and out-of-network facility services. However, by using a PPO network facility, you will save money.  Because 94% of the nation's hospitals participate in the Blue Cross and Blue Shield Association BlueCard PPO Program network, which provides you with access to network care across the county [sic], it should be easy to find a participating facility in a convenient location.

136.  As noted above, in December 2009, defendants sent a letter to GHI-Empire Plan members announcing that, effective January 1, 2010, the GHI-Empire Plan would become a Preferred Provider Organization Plan.  The letter falsely stated: "With a PPO plan, you have

35

access to both in-network and out-of-network care; but, *by using a network facility you can avoid what can be high out-of-pocket expenses*" (emphasis added).

137.  Empire does have an extensive network of participating hospitals, but many doctors who provide services at those hospitals are not part of the network.  As a result, members who choose in-network hospitals are often treated by out-of-network doctors.  It is not true, as the Summary Program Description states, that "you will save money" because the choice of an in-network hospital does not protect the plan member from out-of-pocket expenses.  Nor is it true that "you can avoid what can be high out-of-pocket expenses" because the patient often cannot choose the doctors who provide treatment.  This frequently happens in an emergency hospitalization, when a doctor in the emergency room may not be a hospital employee or a participating provider with the GHI-Empire network.  Before 2015, the GHI Certificate of Insurance did not disclose this gap in coverage.

138.  In short, Empire and GHI misled the City and Plan members into thinking that using in-network hospitals and facilities would enable the member to avoid the higher out-of-network costs.  Defendants induced City employees and retirees to select the GHI-Empire Plan by fraudulently misleading them to think that using in-network hospitals and facilities would enable them to avoid the higher out-of-network costs.

139.  These false statements were material to the City's annual decision whether to renew the GHI and Empire contracts and to offer the GHI-Empire Plan to City employees and retirees.  Payment for out-of-network healthcare services, and the description of how the Plan would reimburse participants for using such services, were (and are) an essential part of the GHI contract.  Disclosure of the true facts would, at a minimum, have influenced the City's annual decision whether to offer the plan to its employees and retirees, and on what contractual terms.

140.  *Third*, GHI falsely described the Enhanced Coverage Rider and overstated the

benefits paid to members who choose to purchase the rider. This rider is an extremely popular part of the GHI-Empire Plan. In 2013, more than 200,000 members chose to purchase this optional rider, at a cost of approximately $6 per month for an individual and $15 per month for a family.

141. Throughout the period covered by this complaint, the Summary Program Description stated that this rider uses an "enhanced schedule for certain services" that "increases the reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%." The same language is contained in the Summary Program Description for 2017. The GHI Certificate of Insurance says that the "enhanced schedule for covered services is in aggregate approximately 165% of the New York City Non-Participating Provider Schedule."

142. On the contrary, the services covered by the rider's "enhanced schedule" are severely limited. The enhanced schedule covers only inpatient hospital procedures, surgery, anesthesia and maternity services. The Plan member who pays for the optional rider does not receive any increased reimbursement for the most common medical services: treatment provided at doctors' offices, and outpatient services at hospitals and other facilities. This fact is not disclosed in the Summary Program Description or in the Summary of Benefits and Coverage.

143. In recent years, the Summary Program Description has included the same misleading language about the optional rider: "Enhanced schedule increases the reimbursement of the basic program's non-participating provider schedule, on average by 75%." The headline states that the "enhanced schedule" covers "out-of-network medical/physician services provided through GHI-EmblemHealth." Four paragraphs later, the Summary Program Description states that the optional rider "provides lower out-of-pocket costs for some surgical and in-hospital services from out-of-network doctors." Defendants do not disclose in the Summary Program Description that the optional rider covers *only* inpatient hospital procedures, surgery, anesthesia

37

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 39 of 64

and maternity services.

144. GHI failed to disclose the severely limited nature of the Enhanced Coverage Rider to Plan members. Plaintiff-relator Ari Maas tried to determine what services are covered by the enhanced reimbursement schedule for Plan members who purchase the optional rider. The GHI customer service representative told him, inaccurately, that the rider provides "increased out-of-network allowances" for services, including "office visits," and that "the same conditions and treatments that are covered in network are allowed out-of-network on this plan."

145. GHI also failed to disclose the severe limitations of the Enhanced Coverage Rider to the City. GHI provided the description of the Enhanced Coverage Rider that was included in the City-distributed Summary Program Description. GHI also wrote and posted the online Summary of Benefits and Coverage, repeating the misrepresentation of the scope of the Enhanced Coverage Rider.

146. As alleged above, GHI is collecting millions of dollars directly from Plan members who select the optional rider for enhanced out-of-network reimbursement. By limiting the scope of the "enhanced reimbursement schedule" to a narrow category of inpatient services, GHI is misleading those Plan members. Defendants induced City employees and retirees to select the GHI-Empire Plan by promoting an Enhanced Coverage Rider and concealing its limited scope.

147. These false descriptions concerning the scope of the Enhance Coverage Rider were material to the City's annual decision whether to renew the GHI and Empire contracts (and on what contractual terms) and whether to offer the GHI-Empire Plan to City employees and retirees. The rider was (and is) an essential part of the GHI contract. Disclosure of the true facts regarding the rider's limited scope would have influenced the City's annual decision whether to renew the contract and on what contractual terms.

148. *Fourth*, GHI falsely described the catastrophic care coverage provided to members

under the GHI-Empire Plan. "Catastrophic Care" is a provision of the GHI-Empire Plan that is supposed to protect members from incurring excessive costs when they become seriously ill. According to the Summary Program Description, the provision takes effect when a member's out-of-pocket expenses for certain out-of-network hospital services exceed $1,500 in a calendar year. According to the GHI Certificate of Insurance, it is triggered when out-of-pocket expenses for those services exceed $3,000 in a calendar year.

149. Starting in 2010 and continuing through the present, GHI eliminated all benefits for catastrophic care to GHI-Empire Plan members who met the requirements for this coverage – while falsely and fraudulently misrepresenting the purported continuation of this important benefit.

150. Before 2010, the NYC Summary Program Descriptions provided that GHI would pay "100% of reasonable and customary charges, as determined by GHI," for catastrophic care after the Plan member paid $1,500 in out-of-pocket expenses. From 2010 to 2017, rather than "100% of reasonable and customary charges," GHI promised to pay "100% of the Catastrophic Allowed Charge as determined by GHI." As a result, the catastrophic care benefit effectively disappeared.

151. Beginning in 2010, there was no effective difference between the reimbursement for out-of-network care paid *before* an GHI-Empire Plan member spent $1,500 on out-of-pocket expenses and the reimbursement paid *after* the member paid that amount. For non-catastrophic care, the Plan offers reimbursement at the standard "allowed amount" contained in the Non-Participating Provider Schedule. For catastrophic care, the Plan offers "100% of the Catastrophic Allowed Charge as determined by GHI." There is no "Catastrophic Allowed Charge" defined in the Plan, in the Summary Program Description, in the Summary of Benefits and Coverage or in any other document provided to members.

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 41 of 64

152.  GHI effectively eliminated the catastrophic care provision of the GHI-Empire Plan while continuing to advertise "catastrophic coverage" as a benefit provided to Plan members in the Summary Program Description.  The 2017 NYC Summary Program Description refers to "catastrophic coverage" as follows:

> Please note that deductibles may apply and that you could be eligible for additional reimbursement if your catastrophic coverage kicks in or you have purchased the Enhanced Non-Participating Provider Schedule, an Optional Rider benefit that provides lower out- of-pocket costs for some surgical and in-hospital services from out-of-network doctors.

153.  Defendants did not send any notice to members concerning this change, as they are required to do by state law.  There is no schedule of the Catastrophic Allowed Charge available to Plan members.  They also failed to file any notice with the State Department of Financial Services, as they are required to do by state law because this change in catastrophic care coverage is clearly a material change in the benefits provided by the GHI-Empire Plan.

154.  Defendants did not notify Plan members or the Department of Financial Services of the change because they were attempting to conceal the elimination of catastrophic coverage from the public and from the City.  Defendants induced City employees and retirees to select the GHI-Empire Plan with false descriptions of the catastrophic care provision of the plan.

155.  These false descriptions of the catastrophic care provision of the plan were material to the City's annual decision whether to renew the GHI and Empire contracts (and under what contractual terms), and whether to offer the GHI-Empire Plan to City employees and retirees.  Catastrophic care was and is an essential part of the GHI contract.  Disclosure of the true facts regarding the limited scope of the catastrophic care coverage would have influenced the City's annual decision whether to renew the contract and on what contractual terms.

156.  <u>Defendants' Efforts to Hide the Truth about the GHI-Empire Plan</u>.  As described above, defendants have made it very difficult for members to locate a description of the GHI-

40

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 42 of 64

Empire Plan stating the terms and conditions of the insurance provided by defendants.  At all times relevant to this complaint, there was no current Certificate of Insurance for Empire's portion of the plan on file with the City's Office of Labor Relations or with the New York State Department of Financial Services.  Despite multiple requests by plaintiff-relator Ari Maas, who is a Plan member, Empire did not provide a Certificate of Insurance or comparable document.

157.  The most current statement of Empire's portion of the Plan is a 32-page booklet dated March 1998.  There is some coverage information in the City's contract with Empire, dated May 2000.  No current statement of Empire's coverage and benefits was publicly available between 2008 and 2014.

158.  The GHI Certificate of Insurance is available on the EmblemHealth website, but the Certificate refers to other documents that are generally not available to the public, including the "schedule of allowances" and the "Non-Participating Provider Schedule of Allowed Charges." The Certificate of Insurance states: "A listing of the Schedule of Allowances and Allowed Charges is on file at GHI's home and regional offices and with the Superintendent of Insurance, State of New York Insurance Department.  It is available for your inspection, at these locations, upon your request, at any reasonable time during regular business hours."  In fact, these documents are not available to the public.

159.  Efforts by the plaintiff-relators to obtain details about the GHI-Empire Plan have been met with resistance and misinformation from the defendants.

160.  Based in part on information provided by plaintiff-relators, the Attorney General's Office determined in the 2014 Assurance of Discontinuance that GHI does not make the reimbursement schedule sufficiently available to GHI-Empire Plan members and prospective members: "NYC employees and retirees could not access a copy of the Schedule through phone requests or email communications to GHI's customer service representatives."

161. It serves GHI's interest to conceal information about the GHI-Empire Plan. Without access to the reimbursement schedule, City employees and retirees cannot make well-informed decisions concerning (i) which health plan to select from the choices provided by the City; (ii) whether to purchase the optional rider with its "enhanced" reimbursement schedule; and (iii) whether to have a specific procedure performed by an in-network or out-of-network physician.

162. Both GHI and Empire knew that their failure to fully disclose their policies and schedules constituted a violation of their obligations to the City and State law. As alleged above, in 2009, GHI and Empire signed an Assurance of Discontinuance with the New York State Attorney General, and agreed to "provide transparent information" about their out-of-network costs and reimbursement. GHI signed a second Assurance of Discontinuance in 2012 where it agreed to clearly inform the public how to obtain out-of-network reimbursement rates for identified procedures.

163. In the 2014 Assurance of Discontinuance, GHI agreed to "provide transparent information" to members about their out-of-network costs and reimbursement. Although GHI put an "Allowance Calculator" on its website for member use, it is still largely useless to members because, "[i]n order to utilize this Allowance Calculator, you must obtain from the provider the specific billing codes for the procedure(s) that the provider plans on performing." In most cases, patients cannot obtain billing codes until they have selected and been examined by a doctor. As a result, the Allowance Calculator is not useful to GHI-Empire Plan members who are trying to determine if they can afford treatment before they choose a doctor. GHI's failure to provide useful guidance to members is inconsistent with its promises to the State of New York in the 2014 Assurance of Discontinuance.

164. There is an effective calculator for medical expenses on the website of FAIR Health,

42

Inc., a provider of medical data and other resources to the healthcare industry.  As alleged above, in 2009, GHI signed an Assurance of Discontinuance with the Attorney General and agreed to use FAIR Health to provide data for its reimbursement schedule.  GHI failed to implement that agreement.

165.  As alleged above, GHI continues to violate the 2014 Assurance of Discontinuance by failing to identify participating providers when requested by Plan members who have pre-scheduled medical procedures, and (when no in-network providers are available) by failing to treat claims for procedures performed by out-of-network providers as if they were performed by participating providers.  This breach of the 2014 agreement continues to harm Plan members as recently as January 2018, particularly retired City employees who reside outside the New York region.

166.  GHI's failures to implement the Assurances of Discontinuance entered into with the Attorney General are not accidental or inadvertent.  They are knowing and intentional, and part of GHI's scheme to defraud the City and Plan members.  GHI's promise to comply with each Assurance of Discontinuance was a material false statement to get GHI's claims paid and its contract with New York City renewed, in violation of the New York False Claims Act.

167.  Using the false and fraudulent statements, omissions and illegal conduct described above, GHI and Empire deliberately exaggerated the benefits available under the Plan, while understating the uncovered costs that must be paid by members.  Defendants fraudulently induced the City to renew their contracts each year.  Defendants fraudulently induced City employees and retirees to select the GHI-Empire Plan and the Enhanced Coverage Rider by exaggerating the coverage and benefits provided to members.

C.  The Systemic Denial of Benefits Due to Plan Members

168.  The City entered into contracts with GHI and Empire for the purpose of providing

43

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 45 of 64

health insurance for the City's employees and retirees. At all times relevant to this complaint, the City paid billions of dollars each year in exchange for a specific insurance policy, the GHI-Empire Plan. In return for those payments, defendants promised to deliver a specific set of benefits to members of the GHI-Empire Plan.

169. The health insurance provided by the GHI-Empire Plan to its members is the essence of the bargain between the City and defendants. Delivery of health insurance according to the terms of the Plan is a material factor in the City's decision whether to pay the bills submitted by Empire and GHI.

170. Empire and GHI routinely deny payment or reimbursement for medical procedures that are covered by the GHI-Empire Plan. Further, when Empire and GHI approve claims submitted by members and their healthcare providers, the insurers routinely pay less than they are required to pay by the terms of the GHI-Empire Plan.

171. In addition, for several years Empire and GHI deliberately reduced their reimbursement rates for out-of-network services by using the undefined and misleading "average county rate" to calculate payments to members. The reimbursements paid were not consistent with the Non-Participating Provider Schedule approved by the City.

i. The Experience of Plaintiff-Relator Kami Barker

172. Between February 2012 and November 2013, Relator Kami Barker was extremely ill and sought medical attention. At all relevant times, Ms. Barker was a member of the GHI-Empire Plan. She was also covered by the optional riders offered by GHI.

173. She was seen by doctors in their offices, in out-patient settings, and she was hospitalized four times, each time at an Empire Blue Cross/Blue Shield in-network hospital.

174. The hospitals submitted $1,260,001 in claims to Empire for her treatment, including $104,480 for physician services at the hospitals. Of the $1,260,001 in claims submitted directly

by the hospitals to Empire, the insurer:

- paid the hospitals $551,564.  This figure reflected the rates that Empire had negotiated with the hospitals as in-network providers;

- told Ms. Barker that she owed $13,424 in deductibles and co-payments; and

- informed Ms. Barker that 225 claims totaling $104,480 in provider charges were not covered by Empire, and should be submitted to GHI for possible coverage.

175.  GHI processed a total of $236,357 in claims – both in-network and out-of-network – for services provided between February 2012 and November 2013, including the $104,480 in in-patient medical claims declined by Empire.  Of the claims processed by GHI:

- 78 claims totaling $10,646 were in-network and the providers were paid directly at their negotiated in-network rate.

- 557 claims totaling $225,711 in provider charges were deemed out-of-network.

- 200 of the out-of-network claims were processed by GHI as inpatient claims that were covered by the Optional Rider.  These claims totaled $123,870 and she received $43,924 in reimbursements, a 35% reimbursement rate.

- 357 of the out-of-network claims were for services rendered in doctors' offices or other facilities not covered by the Optional Rider.  These claims totaled $101,841, and Ms. Barker was reimbursed $16,811 – a 17% reimbursement rate.

176.  Ms. Barker reasonably assumed that the Optional Rider she purchased would have covered the 357 out-of-network claims for services in out-patient and doctors' office facilities. She received no enhanced reimbursement for any of these procedures.

177.  Similarly, because her out-of-pocket expenses exceeded the $1500 Catastrophic Care provision would have been triggered – and that her reimbursements would have been much

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 47 of 64

higher than they were. In reality, she received no reimbursement from the so-called Catastrophic Care provision of the Plan.

178.   During the same period, GHI lost approximately 67 claims, so Ms. Barker did not receive any reimbursement for those services.

179.   As a result of defendants' wrongful refusal to comply with the terms of the GHI-Empire Plan and their contracts with the City, Ms. Barker was required to pay $257,241 for her medical treatment for the period from February 2012 to November 2013.  The combination of wrongfully denied claims, underpaid claims, limitations on enhanced payments from the optional rider, lost claims, and evisceration of the catastrophic benefits combined into a "perfect storm" of extraordinary burden on Ms. Barker.

180.   In the Assurance of Discontinuance in 2012, GHI certified that it _had_ already "trained its staff and modified its claims processing practices, procedures, and policies in order to fully comply with all New York state laws and regulations, GHI's certificates of insurance, and the requirements of this Assurance, and has provided to the OAG documentation of all communications to GHI employees and agents regarding such training and modification."  GHI made this certification on May 12, 2012.  It was not a promise to train its staff and modify its procedures in the future, but an assurance to the State of New York that these changes had been made.

181.   GHI's failure to reimburse expenses incurred by Ms. Barker and the misprocessing of medical procedures began in April of 2012 and continued through August 2103.  GHI's errors, omissions, and misrepresentations with respect to Ms. Barker's coverage were not limited to a single incident or a handful of procedures.  GHI made dozens of errors in handling Ms. Barker's claims, and deliberately denied claims that should have been covered under the terms of the GHI-Empire Plan.

182.  GHI failed to comply with the 2012 Assurance of Discontinuance.  This failure was a violation of state law and a breach of GHI's contract with the City of New York.  Claims for payment for the GHI-Empire Plan after May 12, 2012 were false claims.

ii.  Specific Breaches of the GHI and Empire Contracts

183.  As demonstrated by their refusal to pay for Ms. Barker's healthcare, GHI and Empire have repeatedly failed to pay healthcare claims that are covered by the GHI-Empire Plan, and paid less than the amount properly due for other claims.

184.  Failure to pay for emergency room care and ambulance transport.  Under the GHI-Empire Plan, Empire is required to pay for emergency room services.  In its Summary of Benefits and Coverage, and in its contract with the City, Empire agreed to pay for emergency services "if they are customarily provided in the Hospital," including "facilities, services, supplies and equipment related to Emergency medical care" and "emergency room physician charges."

185.  Empire has not provided coverage to Plan members for emergency room treatment as required by its contract with the City.  For example, in the case of Kami Barker, Empire paid one bill for emergency treatment on December 14, 2012, at Cleveland Clinic, an in-network hospital, but refused to pay two other bills associated with that admission.  Empire also refused to pay two claims for emergency room physician charges at Alta Bates Hospital on March 17, 2013.  As a result, Ms. Barker did not receive the insurance benefits promised to members of the GHI-Empire Plan.

186.  GHI is required to cover ambulance services under the GHI-Empire Plan.  Those services are supposed to be reimbursed at "80% of the Allowed Charge, up to a maximum of $1000 per trip," according to the GHI Certificate of Insurance.

187.  GHI has not provided coverage to Plan members for ambulance services as required

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 49 of 64

by its contract with the City.  For example, in the case of Kami Barker, GHI failed to pay claims for her transport by ambulance to Alta Bates Hospital on March 17, April 11 and May 20, 2013, and also failed to pay for her transport by ambulance to Cal Pacific Medical Center on April 2 and May 6, 2013.  As a result, Ms. Barker did not receive the insurance benefits promised to members of the GHI-Empire Plan.

188.  <u>Paying for In-Network Services at Out-of-Network Rates</u>.  Under the GHI-Empire Plan, the services of physicians and surgeons are covered by GHI if the hospital is a participating provider.  As noted above, all of Kami Barker's treatment was provided by in-network hospitals, yet GHI breached its contract with the City by paying the vast majority of her claims at the lower out-of-network rate.

189.  It is often difficult for members to determine whether the medical care is considered "in-network" or "out-of-network."  For example, if a procedure is performed in a hospital, defendants may treat that procedure as out-of-network even if the hospital is part of the Blue Cross/Blue Shield network or otherwise designated as an in-network hospital.  The determination depends on whether the service is provided on an inpatient or outpatient basis and on whether the doctor who performs the procedure is an in-network provider.

190.  Empire has also violated the terms of its contract by refusing to pay in-network rates for services provided at all hospitals within the Blue Cross Blue Shield network.  In its description of the GHI-Empire Plan in the Summary Program Description, Empire stated:

> [B]y using a PPO network facility, you will save money.  Because 94% of the nation's hospitals participate in the Blue Cross and Blue Shield Association BlueCard PPO Program network, which provides you with access to network care across the county [sic], it should be easy to find a participating facility in a convenient location.

191.  Empire promises to cover physician services at in-network hospitals, including surgeons and anesthesiologists who are employees of those hospitals.

192.  The descriptions of Empire's BlueCard program emphasized the savings associated with treatment at hospitals within the Blue Cross/Blue Shield network.  Empire did not disclose to Plan members, however, that services provided by physicians inside those hospitals would be paid at the out-of-network rate unless the physicians were part of the Plan network.

193.  Effective March 31, 2015, New York amended Article 6 of the Financial Services Law.  Consumers are now protected from "surprise" bills by non-participating, out-of-network doctors who provide services at in-network hospitals or emergency rooms.

194.  Since the effective date of this "no surprises" law, defendants have largely ignored its requirements.  A review of the explanation of benefits of more than one dozen GHI-Empire Plan members living outside New York State revealed that Empire and GHI routinely treat emergency and non-emergency care at Empire in-network hospitals as out-of-network.  They also routinely fail to inform members of their rights under the "no surprises" law.

195.   The consequences of this undisclosed policy were – and still can be -- devastating for GHI-Empire Plan members.  They choose in-network hospitals, but could not always choose the doctors who treated them there, particularly in an emergency.  Ms. Barker did not choose any out-of-network providers from February 2012 to November 2013; they were assigned to her by hospital personnel.  Yet Empire and GHI reimbursed her for those physician services at the out-of-network rate, which is considerably lower than the in-network rate.

196.  In the Assurance of Discontinuance executed in September 2014, GHI and EmblemHealth represented to the State of New York (§ 32) that, starting within 90 days of the effective date:

> GHI will assist GHI Plan members who contact GHI prior to receiving pre-scheduled medical procedures to find participating providers (including ancillary providers, e.g. anesthesiologists and radiologists) so as to ensure that the member can stay in-network. If GHI cannot identify participating providers to provide the ancillary medical services for

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 51 of 64

GHI Plan members' pre-schedules medical procedures, then GHI will treat claims for non-participating providers as if they were performed by participating providers.

197.  GHI has systematically failed to provide GHI members this service.  Upon information and belief, dozens of GHI-Empire Plan members living in Florida, North Carolina, Pennsylvania and other states have contacted GHI seeking in-network providers; GHI has failed to provide them with participating providers; and GHI has systematically failed to treat these procedures as in-network procedures.

198.  Section 33 of the September 2014 Assurance of Discontinuance requires GHI to help Plan members with their payment obligations when those members are treated by out-of-network doctors for emergency room and related admissions treatment.  Upon information and belief GHI has systematically failed to assist members living in Florida, North Carolina, and Pennsylvania who have sought GHI help.

199.  GHI failed to comply with the September 2014 Assurance of Discontinuance.  This failure was a violation of state law and a breach of GHI's contract with the City of New York, which obligates GHI to render services in accordance with applicable laws, rules and regulations. Claims for payment for the GHI-Empire Plan submitted more than 90 days after the effective date of the September 2014 Assurance of Discontinuance were false claims.

200.  Refusing to provide promised benefits for catastrophic care.  As alleged above, "Catastrophic Care" is a provision of the GHI-Empire Plan that protects members from incurring excessive costs when they become seriously ill.  According to the Summary Program Description, it is triggered when a Plan member's out-of-pocket expenses for certain out-of-network hospital services exceed $1,500 in a calendar year.

201.  GHI significantly reduced the payments to members for catastrophic care after 2010. As a result, there was no effective difference between the reimbursement rates that GHI paid for

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 52 of 64

out-of-network care *before* the Plan member spent $1,500 on out-of-pocket expenses and the rates paid *after* the member spent that amount.

202.  Defendants did not send any notice to members concerning this change, as they are required to do by state law.  They also failed to file any notice with the State Department of Finance, although this change in catastrophic care is clearly a material change in the benefits provided by the GHI-Empire Plan.  Because the change was not properly implemented as required by state law, GHI's failure to provide the catastrophic care benefit to eligible Plan members was a violation of the City contract.  Many members, including Kami Barker, were significantly injured by this breach.

203.  In the Assurance of Discontinuance dated September 5, 2014, GHI promised the State of New York that it would "modify all GHI Plan consumer-facing materials … regarding its out-of-network coverage" (§ 27).  GHI has not changed its misleading description of the benefits, if any, of the Enhanced Coverage Rider.  GHI has not changed its misleading description of the benefits, if any, of the Catastrophic Coverage.

204.  <u>Failing to Process Claims Transferred from Empire to GHI</u>.  Claims for hospital services under the GHI-Empire Plan are first submitted to Empire.  Because Empire does not cover some physician services for hospitalized patients, some of these claims are denied by Empire.  These denied claims are electronically transferred to GHI for review.

205.  In an effort to reduce its costs for providing insurance benefits under the GHI-Empire Plan, GHI routinely fails to consider a substantial portion of the claims transferred to GHI by Empire.  These claims are not 'denied' – they are simply ignored.

206.  For example, between March 2 and July 26, 2013, Empire processed 517 claims on behalf of Kami Barker.  Empire paid 292 claims and transferred 225 of these claims to GHI.  Of these 225 claims, GHI partially reimbursed Ms. Barker for 136 claims, denied any payment on

22 claims, and apparently "lost" the remaining 67 claims. They do not appear in GHI's records and were not processed by GHI.

207. GHI has not disclosed, either to the public, the City, or the State Department of Financial Services, its routine failure to evaluate and pay claims for hospital services that are electronically transferred from Empire – claims which are or may be eligible for reimbursement under the GHI-Empire Plan. This failure is a material change in the benefits provided by the Plan and a breach of GHI's contract with the City of New York. It violated New York law, which requires insurers to make good faith efforts to effectuate prompt settlements of claims. N.Y. Ins. Law § 2601(a).

      iii.   Unauthorized Reductions in Reimbursement Rates.

208. At all times relevant to this complaint, GHI and Empire reimbursed GHI-Empire Plan members for their out-of-network healthcare expenses at a rate far lower than the rate required by the terms of the Plan, by City contracts, and by the law. Defendants deliberately hid their low reimbursement rates from the City and from Plan members.

209. The Undisclosed Schedule of Allowable Charges. The Summary Program Description stated that out-of-network reimbursement rates depend on the NYC Non-Participating Provider Schedule of Allowable Charges. "The rate at which you will be reimbursed for a particular service is contained within the Schedule. . . . The subscriber is responsible for any difference between the fee charged [by the healthcare provider] and the reimbursement, as provided by the Schedule."

210. The Summary Program Description stated that "A copy of the Schedule is available for inspection at GHI." According to the Certificate of Insurance, the schedule "is on file at GHI's home and regional offices and with the Superintendent of Insurance" where it is available for inspection on request. These statements are false.

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 54 of 64

211.  In fact, the Non-Participating Provider Schedule is not on file with the State

Department of Financial Services (the successor to the Superintendent of Insurance), and is not

available at GHI headquarters.  In 2014, plaintiff-relators were able to find only one copy (a

binder holding a printout of the Schedule) at a single GHI satellite office.

212.  The Non-Participating Provider Schedule was created in 1983 and last updated in

2004.  GHI was on notice by 2007 – via a New York County Supreme Court ruling – that the

outdated Schedule did not reflect the reasonable and customary cost of current healthcare

services provided to Plan members.  GHI failed to disclose to GHI-Empire Plan members that it

was using 30-year-old data for its Schedule until the Attorney General required that disclosure in

2014.  The reimbursement rates set by the Schedule are far lower than any reasonable person

would expect to receive, based on the information provided by GHI.

213.  Moreover, as alleged above, plaintiff-relators' analysis of reimbursements paid for

out-of-network claims demonstrates that GHI's reimbursement rates have varied during the

period covered by this complaint.  While the amounts charged by healthcare providers steadily

increased from 2008 to 2013, GHI's reimbursements increased for some procedures and

decreased for others.  This fact strongly suggests that the Schedule has changed.

214.  On information and belief, GHI has falsely represented to the City and to Plan

members for the past 10 years or more that its reimbursement rates for out-of-network healthcare

services are based on the Non-Participating Provider Schedule created in 1983 and last updated

in 2004.  In fact, at all times relevant to this complaint, GHI was using a different, undisclosed

schedule for determining its reimbursements to GHI-Empire Plan members.

215.  GHI failed to notify the State Department of Financial Services, the City of New

York and individual members of the GHI-Empire Plan that it had changed the Non-Participating

Provider Schedule after the last revision in 2004, or abandoned it in favor of a different schedule.

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 55 of 64

216.  In 2009, following the Ingenix scandal, GHI entered into an Assurance of Discontinuance with the New York Attorney General in which it agreed to base out-of-network reimbursements on a data provided by a new not-for-profit company, FAIR Health.  GHI agreed to use the new database for a period of five years after it became available from FAIR Health.

217.  Upon information and belief, GHI failed to comply with Assurance of Discontinuance during the period covered by this complaint, and did not use the FAIR Health database to calculate its out-of-network reimbursements.

218.  <u>The Undisclosed and Deceptive Average County Rate</u>.  In December 2009, GHI and Empire notified members of the GHI-Empire Plan that, effective January 1, 2010, reimbursement of out-of-network services would be "80% of the average county rate" after the deductible.  The NYC Summary Program Description for 2010, 2011, and 2012 included language that reflected this change to 80% of average county rate.

219.   Defendants did not define "average county rate" in any documents disclosed to GHI-Empire Plan members.  On information and belief, the term is not used by other health insurance companies.  Defendants used this term to deceive GHI-Empire Plan members into thinking that they would be reimbursed at a rate of 80% of the average price charged by their out-of-network service providers.

220.  Contrary to plain meaning, "average county rate" is not, in fact, a measure of the average charge of medical procedures in any county in the New York City region.  A study of more than 115,000 out-of-network procedures per year, during the three-year period that defendants purported to base their reimbursements on "average county rate," demonstrates that GHI and Empire did not use the actual average cost of those procedures as the basis for their 80% reimbursements.  This study was based on data provided by defendants in their annual reports to the City.

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 56 of 64

221.   In 2010, the average cost for in-patient, out-of-network procedures was $1,174. The average payment to GHI-Empire Plan members for those procedures was $459, a reimbursement rate of 38%.

222.   In 2011, the average cost for in-patient, out-of-network procedures was $1,296. The average payment to GHI-Empire Plan members for those procedures was $463, a reimbursement rate of 36%.

223.   In 2012, the average cost for in-patient, out-of-network procedures was $1,430. The average payment to GHI-Empire Plan members for those procedures was $464, a reimbursement rate of 32%.

224.   In 2013, the average cost for in-patient, out-of-network procedures was $1,616. The average payment to GHI-Empire Plan members for those procedures was $448, a reimbursement rate of 28%.

225.   The study also showed the same pattern of low reimbursements for outpatient procedures.  In 2010, the average cost for outpatient, out-of-network procedures was $1,581. The average payment to GHI-Empire Plan members for those procedures was $607, a reimbursement rate of 39%.

226.   In 2011, the average cost for outpatient, out-of-network procedures was $1,681. The average payment to GHI-Empire Plan members for those procedures was $613, a reimbursement rate of 36%.

227.   In 2012, the average cost for outpatient, out-of-network procedures was $1,877. The average payment to GHI-Empire Plan members for those procedures was $628, a reimbursement rate of 33%.

228.   In 2013, the average cost for outpatient, out-of-network procedures was $1,946. The average payment to GHI-Empire Plan members for those procedures was $629, a

55

reimbursement rate of 32%.

229. In 2014, the average cost for outpatient, out-of-network procedures was $2,118. The average payment to GHI-Empire Plan members for those procedures was $614, a reimbursement rate of 29%.

230. The fact that the average cost of an out-of-network outpatient procedure went up between 2013 and 2014 (from $1,946 to $2,118) while the per-procedure reimbursement went down (from $629 to $614) demonstrates that GHI changed its reimbursement schedule. As alleged above, the use of an undisclosed schedule is a violation of GHI's contract with the City.

231. Even after accounting for deductibles paid by GHI-Empire Plan members, these rates of reimbursement below 40% cannot be reconciled with the "80% of average county rate" reimbursement rate promised by defendants. This failure to reimburse at the promised rate costs GHI-Empire Plan members millions of dollars.

232. In its letter announcing the new average county rate in December 2009, defendants provided an example to show GHI-Empire Plan Members how the insurers would use the new reimbursement rate. In that example, the "total hospital bill" was $15,000, and the "Empire Average County Payment Rate" was $11,500, or 77% of the total hospital charge. After the deductible and co-payment, the insurer paid $9,000 of the $15,000 bill, or 60%.

233. In reality, Empire and GHI did not reimburse GHI-Empire Plan members for out-of-network services at anything close to the rate of 60% described in their letter. It was the *members* who paid at 60% (or more) of those charges, while the insurers paid 40% (or less).

234. This pattern of underpayments, in addition to harming members, directly harmed the City of New York. The City contributes annually to the Management Benefits Fund ("MBF"), which provides supplemental benefits to the City's non-unionized personnel. The MBF includes a Superimposed Major Medical Plan ("SMMP") that reimburses MBF participants

56

for most of their out-of-network medical expenses that were not paid by the employee's health insurance plan. The MBF pays the difference between what the participant received from his or her insurance plan and 90% of the usual and customary charge for the medical procedure.

235. Because GHI and Empire failed to reimburse members of the GHI-Empire Plan for their out-of-network healthcare at the required rates, the City has been forced to expend several million dollars annually reimbursing the non-unionized personnel covered by the SMMP.

<u>False Certification of Compliance with the GHI and Empire Contracts</u>

236. As alleged above, the City's contracts with GHI and Empire require defendants to comply with all applicable law, rules, and regulations when they provide the insurance services described in the contracts and the GHI-Empire Plan.

237. By submitting claims to the City of New York for payment under their contracts, GHI and Empire certified that they provided insurance to GHI-Empire Plan members in compliance with all applicable laws, rules and regulations.

238. In fact, GHI and Empire repeatedly violated applicable laws during the period covered by the complaint. They knowingly submitted claims for payment to the City of New York when they were violating those laws. The violations were material to the City's decision to pay claims to GHI and Empire, and to renew their contracts.

239. Among other illegal acts, GHI and Empire violated the Insurance Laws of New York State when they (i) failed to file with the New York State Department of Financial Services ("DFS") notice of a material change with respect to the elimination of catastrophic care coverage under the GHI-Empire Plan; (ii) failed to file with DFS notice of a material change with respect to the change from "average county rate" to "Allowed Rate" for in-hospital, out-of-network reimbursements; (iii) failed to notify Plan members about a material change in the GHI-Empire Plan when they effectively eliminated catastrophic care coverage; (iv) failed to notify Plan

members about a material change in the GHI-Empire Plan when they changed the reimbursement rate from "average county rate" to "Allowed Rate"; and (v) provided a misleading explanation of "average county rate" in the letter sent to Plan members in 2009 and other publications.

240.   In addition, Empire violated state law when it did not file a Certificate of Insurance with DFS and failed to provide copies of the Certificate of Insurance to Plan members who requested it.

241.   GHI also violated the three Assurances of Discontinuance that it signed in 2009, 2012 and 2014 to resolve enforcement actions by the New York State Attorney General, as alleged above.

Damages to the State and City of New York

242.   Each year during the period covered by this complaint, GHI knowingly overstated the amount that it spent to cover members' medical expenses under the GHI-Empire Plan and retained funds for its own benefit that should have been returned to the City.  As a result, the City was damaged by at least $500 million since 2008.

243.   Each year during the period covered by this complaint, defendants used fraudulent statements to induce the City of New York to renew their contracts and to offer the GHI-Empire Plan to the City's employees, retirees and their families.  As a result, the City has been damaged in an amount equal to all contract payments, premiums and retention paid to defendants in respect of the GHI-Empire Plan during that period.

244.   At all times during the period covered by this complaint, defendants made claims for payment under their contracts with the City when they knew that they were not providing the insurance benefits required by those contracts to GHI-Empire Plan members.  As a result, each of those claims is a false claim.  The City has been damaged in an amount equal to the total of the false claims paid to defendants.

245.  The misconduct of GHI and Empire has also damaged the State of New York by wrongfully diverting State funds away from their intended purpose and into the pockets of defendants.  New York State provided at least 17% of the funds paid by the City to defendants in respect of the GHI-Empire Plan.  Those funds were intended to pay for health insurance for City employees who carry out important programs of interest to New York State, such as schoolteachers – not to pay for defendants' false claims.  Defendants are liable to the State for at least 17% of the amounts they received for the GHI-Empire Plan during the period covered by this complaint.

### COUNT ONE
**On Behalf of the State and City of New York Against All Defendants**
**New York False Claims Act, N.Y. State Fin. Law § 189(1)(a)**

246.  Relators repeat and reallege paragraphs 1 through 245 as if fully set forth herein.

247.  This is a claim for treble damages and penalties under the New York False Claims Act.  Through the acts described above and otherwise, defendants GHI, EmblemHealth and Empire knowingly, or in deliberate ignorance or reckless disregard for the truth, presented and caused to be presented to New York City false or fraudulent claims for payment for health care services.

248.  New York City is a recipient of funds from the State of New York, including funds allocated to advance the State's interest in protecting the health of City employees and their families through sound, affordable health insurance.  The funds paid by New York City to GHI, EmblemHealth and Empire as premiums for the GHI-Empire Plan are paid on behalf of both the State and the City of New York.  N.Y. State Fin. Law § 188(1)(a)(ii).

249.  By reason of defendants' conduct, the State and City of New York have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

250.  Defendants are liable to the State and City of New York for treble damages,

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 61 of 64

penalties of not less than $6,000 and not more than $12,000 per false or fraudulent claim, and

costs pursuant to N.Y. State Finance Law § 189(1)(a).

### COUNT TWO
**On Behalf of the State and City of New York Against All Defendants
New York False Claims Act, N.Y. State Fin. Law § 189(1)(b)**

251.   Relators repeat and reallege paragraphs 1 through 245 as if fully set forth herein.

252.   This is a claim for treble damages and penalties under the New York False Claims

Act.  Through the acts described above and otherwise, defendants GHI, EmblemHealth and

Empire knowingly, or in deliberate ignorance or reckless disregard for the truth, made, used, or

caused to be made or used false records and/or statements to get false or fraudulent claims paid

or approved by New York City.

253.   New York City is a recipient of funds from the State of New York, including funds

allocated to advance the State's interest in protecting the health of City employees and their

families through sound, affordable health insurance.  The funds paid by New York City to GHI,

EmblemHealth and Empire as premiums for the GHI-Empire Plan are paid on behalf of both the

State and the City of New York.  N.Y. State Fin. Law § 188(1)(a)(ii).

254.   By reason of defendants' conduct, the City and State of New York have been

damaged, and continues to be damaged, in a substantial amount to be determined at trial.

255.   Defendants are liable to the State of New York for treble damages, penalties of not

less than $6,000 and not more than $12,000 per false or fraudulent claim, and costs pursuant to

N.Y. State Finance Law § 189(1)(b).

### COUNT THREE
**On behalf of the City of New York Against GHI and EmblemHealth
New York False Claims Act, N.Y. State Fin. Law § 189(1)(d)**

256.   Relators repeat and reallege paragraphs 1 through 245 as if fully set forth herein.

257.   This is a claim for treble damages and penalties under the New York False Claims

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 62 of 64

Act.  At all times relevant to this complaint, Defendants GHI and EmblemHealth had possession, custody and control of money to be used by the State and City of New York, and knowingly delivered less than all of that money to the City of New York.

258.  As alleged above, GHI and EmblemHealth did not rebate funds that they knew to be due to the City of New York.  The State of New York provided some of the funds that defendants received from the City but knowingly failed to rebate.

259.  By reason of this conduct, the State and City of New York have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

260.  Defendants GHI and EmblemHealth are liable to the State and City of New York for treble damages, penalties of not less than $6,000 and not more than $12,000 per false or fraudulent claim, and costs pursuant to N.Y. State Finance Law § 189(1)(d).

## COUNT FOUR
### On behalf of the City of New York Against GHI and EmblemHealth
### New York False Claims Act, N.Y. State Fin. Law § 189(1)(g)

261.  Relators repeat and reallege paragraphs 1 through 245 as if fully set forth herein.

262.  This is a claim for treble damages and penalties under the New York False Claims Act.  Defendants GHI and EmblemHealth knowingly made, used, or caused to be made or used, false records and statements material to their obligation to pay money to the City of New York.

263.  As alleged above, GHI and EmblemHealth presented false reports concerning the GHI-Empire Plan, including the Statements of Experience, that understated the amounts that they knew to be due to the City of New York.  The State of New York provided some of the funds that defendants received from the City but knowingly failed to rebate.

264.  By reason of this conduct, the State and City of New York have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

265.  Defendants GHI and EmblemHealth are liable to the State and City of New York

Case 1:22-mc-00200-PAE-KHP   Document 14-6   Filed 08/17/22   Page 63 of 64

for treble damages, penalties of not less than $6,000 and not more than $12,000 per false or fraudulent claim, and costs pursuant to N.Y. State Finance Law §§ 189(1)(g).

### COUNT FIVE
**On behalf of the City of New York Against GHI and EmblemHealth**
**New York False Claims Act, N.Y. State Fin. Law § 189(1)(h)**

266.   Relators repeat and reallege paragraphs 1 through 245 as if fully set forth herein.

267.   This is a claim for treble damages and penalties under the New York False Claims Act.  Defendants GHI and EmblemHealth knowingly concealed or fraudulently decreased their obligation to pay or transmit money to the City of New York.

268.   As alleged above, GHI and EmblemHealth presented false reports concerning the GHI-Empire Plan, including the Statements of Experience, that concealed the true amounts that they knew to be due to the City of New York.  The State of New York provided some of the funds that defendants received from the City but knowingly failed to rebate.

269.   By reason of this conduct, the State and City of New York have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

270.   Defendants GHI and EmblemHealth are liable to the State and City of New York for treble damages, penalties of not less than $6,000 and not more than $12,000 per false or fraudulent claim, and costs pursuant to N.Y. State Finance Law § 189(1)(h).

### JURY DEMAND

Relator hereby demands a trial by jury of any issue of fact triable of right by a jury.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff-relators Steve Cohen, Ari Maas and Ariella Barker, on behalf of the City and State of New York, demand and pray that judgment be entered in plaintiffs' favor against defendants as follows:

62

Case 1:22-mc-00200-PAE-KHP  Document 14-6  Filed 08/17/22  Page 64 of 64

1.    On the First, Second, Third, Fourth and Fifth Counts under the New York State False Claims Act, as amended, treble the amount of damages sustained by the State and City of New York and civil penalties for each false claim or false statement, as provided by law;

2.    Injunctive relief prohibiting ongoing violations of defendants' contracts with the City, including failure to provide the healthcare insurance coverage due to GHI-Empire Plan members; and

3.    The maximum amount allowable under State Finance Law § 190(6) for bringing this action.

4.    All legal fees and other expenses incurred by plaintiff-relators in connection with this legal action plus interest, as provided by law, and any other relief this Court deems just and proper.

Dated:  January 31, 2018

WILLENS & SCARVALONE LLP

By: _____
        Jonathan A. Willens
        Edward Scarvalone
40 Wall Street, Suite 4100
New York, New York 10005
Telephone: (646) 200-6333
Fax: (800) 879-7938
jawillens@willensscarvalone.com
*Attorneys for Plaintiff-Relators*

63